ANTONIA M. PASTORE, Plaintiff, *v.* FILIPPO PASTORE, Defendant.

Supreme Court, Equity Term, Cayuga County, September 15, 1950.

*George M. Michaels* for plaintiff.
*William S. Elder, Jr.,* for defendant.

CRIBB, J. The plaintiff, Antonia Maria Pastore, brings this action in equity court to secure an annulment of her marriage to the defendant, Filippo Pastore, on the grounds of fraud, specifically alleging that the defendant induced her to marry him through fraudulent representations that he loved her and intended to be a husband to her, whereas in fact the marriage was entered into on his part solely to facilitate his entry into the United States.

Throughout the trial these parties were referred to respectively as Ann and Phil, and will be so designated herein. Peter Pastore, hereinafter called Pete, as at the trial, played an important role in this unfortunate marriage.

This decision must turn for the most part on the credibility of the witnesses. The attorneys for the respective parties have submitted briefs reviewing the important testimony and presenting possible inferences to be drawn therefrom. To do justice between the parties demands a search for the truth — a most difficult task under the circumstances here presented.

Upon reviewing all the evidence in the case, and considering the arguments of counsel, there unfolds a most dramatic course of events. Looking at the whole picture I have reached certain conclusions which to me seem inescapable. In actions for annulment of a marriage we usually find only two important characters, but here we have a third, Pete, the brother of Phil, who plays a part which in many particulars completely overshadows the defendant, Phil.

Leaving his native Italy early in life Pete came to the United States where fortune favored him with a family and prosperity. He had become a mason-contractor and wanted his younger brother to leave Italy and come to the United States believing he would be of help to him in that business. Being familiar with the quota system established by the United States Government for Italian immigrants, he realized the difficulties which ordinarily would be encountered in securing entry of Phil into our country. He also understood that if Phil could marry a citizen of the United States he would be permitted to enter and remain in that country.

Being acquainted with Ann and her family, also of Italian extraction, he suggested to her in December, 1947, that she might marry Phil if she knew him. With this idea in mind, he wrote his brother Phil in Italy, asking him to write Ann, she having consented to reply if he wrote her first. This was followed by an exchange of photographs and correspondence which resulted in a courtship by mail.

It developed at the trial that while Pete, after his marriage, had returned to Italy for a visit on two occasions, he did not take his wife with him. She was angry and often expressed the desire to visit her relatives in Italy. Accordingly, about one year after instigating the courtship between Ann and Phil, Pete secured passage to Italy for his wife, Ann and himself, also arranging to have his automobile shipped to Italy. They arrived in Italy December 12, 1948.

In Italy, Pete arranged for the marriage of Ann and Phil. A wedding gown was purchased for Ann. Phil and Ann were married at San Michele January 22, 1949. Following the wedding was a large reception arranged by Pete who hired a hall, and an orchestra, supplied quantities of food, candy, liquor, and beer. After the wedding Pete, his wife, Ann and Phil remained a few days at a hotel in Bari. Then in Pete's car they visited Rome, Naples and Pompeii and other places of interest. Pete procured necessary hotel accommodations for the party. Ann gave Pete $500 from her savings to meet a part of the expenses. This amount, however, was only a fraction of the entire cost of this trip to Italy and return to the United States.

All of the above facts are undisputed. The question of credibility of witnesses arises principally in connection with two occasions. One concerns a happening on the honeymoon in Italy and the other the arrival of Phil in the United States several months after the wedding.

The first episode occurred the sixth night after the marriage while the parties were staying at the hotel in Bari. All had attended the opera that evening and had returned to the hotel about midnight. Ann and Phil had gone to bed. Pete and wife had retired to their room on the floor above. Some two hours later Pete telephoned Phil that he was coming down to their room. Phil got up and was partially dressed when Pete arrived and ordered Ann to get up and put on her dressing gown. Pete's wife came in a few minutes later. Pete then said that Phil had told him that he had discovered that Ann was not a virgin when he married her, and that she had admitted to having had sexual intercourse, against her will, with a named man in Auburn some four years previously. According to the testimony of Pete and his wife, Ann then admitted that this was true. It is not necessary to relate the details of this episode. Ann became hysterical. Phil tried to comfort her, but later, after Pete and wife left them, he became very nervous and acted so strangely that Ann telephoned Pete early the following morning to come down to the room. Ann's testimony substantially corroborates that of

Pete and his wife as to this episode occurring at two o'clock in the morning, with the exception of her part in the conversations. She denies emphatically that she ever told Phil, her husband, that she ever had sexual intercourse with any man under any circumstances; that when he asked her, after their marriage, whether she had ever had any boy friends, she told him that she had gone to the movies two or three times, and with whom she went. She denies that she admitted any such acts to Pete and his wife when they came to their room, or at any other time, and further denies ever having had sexual intercourse with any man prior to her marriage.

Following this unhappy occurrence the parties toured some parts of Italy and according to Ann's testimony Phil assured her that everything was all right and expressed his love for her. Phil testified that when he told Pete that he had discovered Ann was not a virgin, Pete said: '' She is a good girl. You better keep your mouth shut, so when you come to the United States, then you see what you got to do.'' This statement was not denied by Pete, and is indicative to me of Pete's real purpose in promoting the marriage.

Before leaving Italy the parties went to the American consulate at Naples for the purpose of instituting proceedings to secure Phil's legal entry into the United States. She signed an affidavit as to their marriage, and purpose to have a home in the United States and live together as man and wife, and, further, in effect that no proceedings would be instituted to invalidate the marriage.

Sailing from Naples February 19, 1949, Ann with Pete and wife arrived in New York March 1, 1949. Phil arrived in Auburn, October 29, 1949. During this eight-month interval Phil and Ann exchanged loving letters. There was nothing in Phil's letters which could cause Ann to suspect that her husband later would refuse to live and cohabit with her as husband and wife. During this interval Ann sent Phil about $270. He asked Ann to send him an airplane ticket from Rome to New York. She complied, paying therefor from her own savings $465. She also spent $450 for furniture in anticipation of her new home with Phil. She also purchased shirts and other clothing to present to her husband upon his arrival. All of these acts demonstrate the good faith and honest intentions of Ann.

Phil's departure for America was postponed from time to time — he untruthfully writing Ann that he was having trouble securing his visa. Finally Pete, or some one at his home, telephoned Ann to come over to his house — on the morning of

October 29, 1949. She was astonished to see her husband sitting by the kitchen table. He failed to greet her — in fact did not even rise from his chair. Ann testified that Pete and wife began talking, again bringing up the question of her chastity before marriage, and that Phil finally informed her that the marriage was off; that he was supposed to live with Pete's family and that she would live, as before, with her people. Some of Ann's testimony as to what was said on this occasion is disputed. Pete testified he tried to effect a reconciliation between Phil and Ann at that time. Ann says otherwise. The attempt has been made to convince this court that Ann's conduct caused the marital difficulties — particularly in that she reported the matter to the immigration authorities. It is true she did this and promptly commenced this action. Having made the affidavit before the American consulate above referred to, and the marriage having gone on the rocks she could not for her own protection do less than explain to the immigration authorities what had happened.

At the time of trial Pete testified as to his attempts to effect a reconciliation between the parties to this action. Fear of Phil's deportation may well have motivated such attempts. In any event, having exercised the master mind over Phil up to the time of the latter's first meeting with Ann in this country, it seems strange that Phil would then refuse to accept her if his brother urged otherwise. In fact I find no credible evidence of any attempt by either Phil or Pete for a reconciliation until the question arose as to the possible deportation of Phil.

After considering all of the acts, conversations, and circumstances surrounding this unfortunate courtship and marriage, I feel that Ann's testimony is most worthy of belief. The defendant, until he arrived in the United States, protested his love for the plaintiff, and verbally and by letter planned with her a future home to be shared as husband and wife. Upon arrival he failed to accept his wife or make any effort to establish a home. While he testified in court that he still loved the plaintiff and wanted a reconciliation his every act, after he entered the United States, belies the words.

This court finds that the plaintiff has met the burden of proving her case by a fair preponderance of the credible evidence, and is, therefore, entitled to the relief demanded in the complaint.

Findings and proposed judgment may be submitted accordingly.